## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

MICHAEL I. GOLDBERG, as Receiver
of Cyprus Funds, Inc. and its affiliates;
and Lloyd L. Smith and Shirley Estes,
individually and on behalf of others
similarly situated

       Plaintiffs,

vs.

FIRST UNION NATIONAL BANK,
a National Banking Association, a
successor by merger to First Union
National Bank of Florida; and FIRST UNION
SECURITIES, INC., a successor by merger to
First Union Brokerage Services,
a subsidiary of First Union
National Bank

       Defendants

_____/

CASE NO. **00 - 4485**

**CIV-GRAHAM**

MAGISTRATE JUDGE

**TURNOFF**



### RECEIVER'S ANCILLARY COMPLAINT
### CLASS ACTION COMPLAINT

Plaintiffs, Michael I. Goldberg, as Receiver for Cyprus Funds, Inc. and its affiliates (the

"Receiver"), and Lloyd L. Smith and Shirley Estes, individually and on behalf of others similarly

situated (the "Class Representatives")(the Receiver and Class Representatives are sometimes

collectively referred to herein as "Plaintiffs"), hereby sue the Defendants First Union National Bank

and First Union Securities, Inc. and allege as follows:

### THE PARTIES

1.      The Receiver has been designated by the United States District Court for the

Southern District of Florida as the Receiver of Cyprus Funds, Inc. and its affiliates (hereinafter

referred to collectively as "Cyprus Funds") by Order dated August 27, 1999 and entered in the action styled *Securities and Exchange Commission vs. Latin American Services Co., Ltd., Cyprus Funds, Inc., et. al,* case no. 99-2360-CIV-UNGARO-BENAGES (the case was originally assigned to Judge Davis and has subsequently been assigned to Judge Ungaro-Benages). The Receiver is authorized to investigate the affairs of Cyprus Funds and to marshal assets for the benefit of Cyprus Funds and defrauded investors, including the claims alleged in this action.

2.      Class Representative Lloyd L. Smith ("Mr. Smith") is a resident of Louisville, Ohio, and is *sui juris.* From 1997-1999, Mr. Smith invested over $600,000.00 in Cyprus Funds with its Fund Custodian, First Union. Class Representative Shirley Estes ("Ms. Estes") is a resident of Akron, Ohio and is *sui juris.* In 1998, Ms. Estes invested over $228,000.000 in Cyprus Funds with its Fund Custodian, First Union.

3.      Defendant, First Union National Bank ("First Union"), is a National Banking Association. At all times material to this action, First Union maintained offices and agents and did business within the State of Florida and in Miami-Dade County, Florida. First Union National Bank is a successor by merger to First Union National Bank of Florida. For purposes of the claims alleged by Plaintiffs, First Union National Bank is the successor to and liable for all wrongdoings of First Union National Bank of Florida, N.A. at issue in this action.

4.      Defendant, First Union Securities, Inc. ("First Union Securities"), is a successor by merger to First Union Brokerage Services, Inc. ("FUBS"), and a registered broker-dealer, a member of the National Association of Securities Dealers, and a separate non-bank affiliate of First Union Corporation. At all times material to this action, First Union Securities maintained offices and agents and did business within the State of Florida and in Miami-Dade County, Florida. For

2

purposes of the claims alleged by Plaintiffs, First Union Securities is the successor to and liable for all wrongdoings of FUBS. First Union National Bank, First Union Securities, Inc. and First Union Brokerage Services, Inc. will be collectively be referred to as "First Union."

## JURISDICTION & VENUE

5.     Pursuant to 28 U.S.C. §1332, this Court has original jurisdiction in this matter as the amount in controversy exceeds $75,000, exclusive of interest and costs, and the matter is between citizens of different states, and under the doctrine of supplemental jurisdiction. Jurisdiction also exists under 28 U.S.C. §754 because this matter involves a Receiver with property located in different districts.

6.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and (c), or alternatively §1391 (a), because Defendants reside in, maintained offices and agents and did business in this District and because the wrongful acts committed by Defendants were conceived, formulated, carried out, or committed in this District.

## THE FACTS

**The Ponzi Scheme Perpetrated by Cyprus Funds, Inc. and its Principals**

7.     Between 1995 and August of 1999, Eric V. Bartoli ("Mr. Bartoli") was the primary principal, director, and insider of Cyprus Funds. Mr. Bartoli and the other Cyprus Funds principals (hereinafter referred to as "insiders") operated the company as a classic Pyramid and Ponzi scheme to defraud investors.

8.     According to Cyprus Funds' Confidential Private Placement Memorandum ("PPM"), Cyprus Funds was incorporated in Belize in January, 1996 and was an open-ended mutual fund purportedly formed for the purpose of making investments in different geographical locations

3

in Latin America, Canada and the United States.

9.      Since at least 1994,[1] Cyprus Funds has offered and sold shares of its mutual fund in the United States to investors through a network of sales representatives affiliated with Cyprus Funds, using a number of different sales methods and general solicitations.  Cyprus Funds sales efforts in the United States primarily targeted retirees, where it was presented a safe, conservative investment providing a tax-free monthly stream of income.

10.     Through its investment adviser, Latin American Services Co., Ltd.("LASCO"), Cyprus Funds' investors were mailed monthly statements and newsletters informing them of the status of Cyprus Funds' investments and a valuation of its shares.

11.     In mid-1998 Mr. Bartoli and the insiders ceased purchasing any new investments for Cyprus Funds and began liquidating the mutual fund's foreign security positions.  The monies generated by the mass liquidation of the mutual fund's foreign security positions in mid-1998 were transferred to Cyprus Funds' bank accounts maintained at First Union by the end of February or early March of 1999.

12.     Early in 1999 Cyprus Funds stopped honoring redemption requests made by Latin American investors.  By the end of May 1999, Mr. Bartoli was telling these investors that he was in the process of selling Cyprus Funds, and that financial statements needed to be prepared in connection with the sale, requiring suspension of account activity.  However, at or around the same time, Cyprus Funds posted a website on the Internet to attract new investors, offering the sale of

---

[1] Although Cyprus Funds was incorporated in Belize in 1996, sales literature distributed to investors includes a chart showing the mutual fund was generating favorable returns since 1993. Upon information and belief, sometime prior to 1995, Mr. Bartoli created a mutual fund called Cyprus Trust, S.A., a foreign corporation organized under the laws of Uruguay.

4

Cyprus Funds' shares worldwide.

13.     In July 1999, monthly dividend checks issued by Cyprus Funds to United States investors receiving monthly income statements were rejected or returned for insufficient funds.

14.     Cyprus Funds was a Ponzi scheme, in which money raised from new investors was used to pay "redemptions" or "interest" to old investors.  Contrary to the representations made by Mr. Bartoli and the insiders, Cyprus Funds only devoted a small fraction of the funds it raised from investors to purchase securities and commodities.  The bulk of the funds raised by Cyprus Funds were diverted to the personal use of Mr. Bartoli, the insiders and their affiliated companies.  Among other things, Mr. Bartoli purchased almost 1,500 acres of farmland in Ohio using Cyprus Funds' investor funds.   Mr. Bartoli also used investor money to make elaborate and expensive improvements to this property and bought farm equipment and supplies to pay the general operating expenses of the farms.   In sum, approximately $8 million dollars of investor funds was wrongfully diverted to this property, as well as other Ohio properties purchased by Mr. Bartoli.   Additionally, approximately $14 million dollars of Cyprus Funds' investor monies intended to purchase Cyprus Funds shares were used by Mr. Bartoli and the insiders for B&S Farms, Inc. (controlled by Mr. Bartoli and two other Cyprus Funds insiders) and Flanders Investments Holdings Limited, Inc. (controlled by Mr. Bartoli and his wife) and other related entities/companies that they owned.

15.     All proceeds raised by investors in the United States and abroad were wire transferred to or otherwise deposited in Cyprus Funds' bank accounts maintained at First Union in Miami, Florida, where Cyprus Funds also maintained its brokerage account with FUBS.

16.     First Union was described to investors as the "Fund Custodian" and was listed as the "Custodian for the Fund in the United States" in Cyprus Funds' PPM.

5

17.     As the fund custodian, First Union was responsible for holding the mutual fund's assets using the same degree of care it exercised when it held other assets in a fiduciary capacity. Further indica of a special relationship between Cyprus Funds and First Union is found in the fact that First Union provided extensive brokerage services to Cyprus Funds.

18.     In August 1999, the Securities and Exchange Commission brought an action seeking injunctive relief against Cyprus Funds, Mr. Bartoli and the insiders.  On August 27, 1999, the District Court for the Southern District of Florida entered an Order ("Order") restraining these individuals and entities from further fraudulent activities and froze their assets.  A copy of this Order is attached hereto as Exhibit "A."

**First Union's Role in Perpetuating the Cyprus Funds Ponzi Scheme**

19.     Mr. Bartoli chose First Union to be the bank that would accommodate his fraudulent scheme.  Zoraida Diaz ("Ms. Diaz"), was Mr. Bartoli's initial and main contact at First Union. Ms. Diaz was employed as a relationship manager in either the domestic or international division of First Union at the downtown Miami branch.  Soon after meeting Ms. Diaz, Mr. Bartoli was introduced to John Romanach ("Mr. Romanach"), who was employed by FUBS as a personal investment counselor at the First Union downtown Miami branch.

20.     At all times material to this action, Ms. Diaz and John Romanach were acting as agents of First Union and First Union Securities, and were acting within the course and scope of their agency. As such, First Union is vicariously liable for Ms. Diaz' and Mr. Romanach's wrongful acts.

21.     Ms. Diaz was introduced to Mr. Bartoli in 1995 through his attorney, Leslie Rozencwaig ("Mr. Rozencwaig"), who also happened to be one of Ms. Diaz' existing clients.  Mr. Rozencwaig informed Ms. Diaz that Mr. Bartoli had a mutual fund and that he wanted to set up a

6

local banking relationship.

22.     Ms. Diaz set up a First Union checking account and a First Union CAP Account[2] for

Cyprus Funds (collectively referred to as "Cyprus Funds' First Union accounts"). Ms. Diaz also

opened additional First Union accounts for Mr. Bartoli's personal use. Cyprus Funds' investors

would deposit monies into Cyprus Funds' First Union accounts. Ms. Diaz knew that Cyprus Funds'

investors were writing checks to Mr. Bartoli and these checks were being deposited into Cyprus

Funds' First Union accounts.

23.     After Mr. Bartoli inquired into First Union's brokerage services, Ms. Diaz referred

Mr. Bartoli to Mr. Romanach, who soon thereafter became Mr. Bartoli's investment counselor at

FUBS. Mr. Romanach assisted Mr. Bartoli in trading stocks for Cyprus Funds' mutual fund.

24.     In 1995, when Cyprus Funds' First Union accounts were first opened, Mr. Bartoli

provided Ms. Diaz and Mr. Romanach an entire package of Cyprus Funds promotional literature.

25.     After Cyprus Funds' First Union accounts and Mr. Bartoli personal accounts were

opened and continuing until it was frozen by a Court-ordered injunction, First Union, Ms. Diaz and

Mr. Romanach completely and utterly failed to follow industry standards and First Union's own

internal rules, to get to "know your customer." These rules require some level of reasonable inquiry

to determine the intended purpose of a customer's transactions and whether a customer's business

operations, and the proceeds of those operations, constitute an illegitimate or illegal scheme. To the

contrary, First Union, Ms. Diaz and Mr. Romanach either knew about the Cyprus Funds fraud run

by Mr. Bartoli, or willfully ignored the abundant evidence that was present. First Union's own bank

---

[2] A CAP account is a combination of a checking and brokerage account.

statements reflect several significant transfers from Cyprus Funds' First Union accounts into Mr. Bartoli's and the insiders' other companies. Furthermore, Ms. Diaz and Mr. Romanach were aware that Mr. Bartoli was financing his very lavish lifestyle, while at the same time Cyprus Funds' mutual fund's assets were depleting. For example, while investors' redemption and interest checks were being rejected for insufficient funds, Mr. Bartoli was purchasing over 1,500 acres of farmland in Ohio (plus top of the line equipment to operate these farms), commercial buildings, and a second residence in Ohio for his personal use.

26.     Mr. Bartoli frequently wrongfully transferred monies, ranging from $5,000 - $125,000 out of and into Cyprus Funds' First Union accounts from 1996-1999. More specifically (to name just a few of the hundreds of wrongful transfers), on October 14, 1997 Mr. Bartoli requested that Ms. Diaz wire transfer $94,911.35 from Cyprus Funds' First Union CAP account to Ladder Livestock Company, and on March 10, 1998, he requested that she wire transfer $40,988.16 from Cyprus Funds' First Union account to Ladder Livestock Company - - a company which sells sheep. Copies of these requests and supporting documentation are attached hereto as Composite Exhibit "B." Nowhere does Cyprus Funds' PPM, the same PPM which names First Union as the Fund Custodian, indicate that Cyprus Funds was going to invest in sheep or livestock. Although these documents clearly demonstrate that Mr. Bartoli was wrongfully diverting investors' funds for his personal use, First Union, Ms. Diaz and Mr. Romanach chose to ignore these signs and First Union breached its fiduciary duty as Fund Custodian. This duty was also breached when First Union, Ms. Diaz and Mr. Romanach turned a blind eye to the fact that Mr. Bartoli was wrongfully diverting monies invested by Cyprus Funds' investors when he:

(A)     wire transferred over $1.4 million to Flanders Investment, his wholly owned

8

corporation, for his personal use;

(B)     wrote checks from the Cyprus Funds' CAP account totaling over $1.6 million to American Express; and

(C)     transferred $306,697.00 to Sterling Farm Equipment for the purchase of farm supplies for his farms.

27.     Additionally, First Union assisted Mr. Bartoli in making wire transfers between Cyprus Funds' First Union accounts and Cyprus Funds' bank account at Banco del Pichincha, an Ecuadorian bank.   There were over twenty-three (23) wire transfers out of Cyprus Funds' First Union accounts and into Cyprus Funds' accounts at Banco del Pichincha.   Moreover, during 1998 there were over fourteen (14) wire transfers from Cyprus Funds' Banco del Pichincha account to Cyprus Funds' First Union accounts, totaling more than $1,604,313.00.  Latin American investor monies, which were initially deposited into Banco del Pichincha, were wrongfully transferred into Cyprus Funds' First Union accounts so that Mr. Bartoli and the insiders could easily divert these monies for their own personal use.  Such transfers include (although there were many more):

(A)     On October 6, 1998, $70,000.00 of Cyprus Funds' monies from Banco del Pichincha was deposited into Cyprus Funds' First Union CAP account.  Two days later, more than $80,000.00 was transferred from this First Union account to B&S Farms, Semaphore, and Flanders Investment – companies which are owned and controlled by Mr. Bartoli and the insiders;

(B)     On December 22, 1998, $55,666.37 of Cyprus Funds' monies from Banco del Pichincha was deposited into Cyprus Funds' First Union CAP account.  Within a few days, $34,000.00 was transferred from this First Union account

9

to B&S Farms and Semaphore.   Around this same time, $22,000.00 was transferred from Cyprus Funds' CAP account at First Union to American Express.

During the time these transactions were being made, Mr. Bartoli was one of Ms. Diaz' and Mr. Romanach's largest clients.

28.     Industry standards, as well as First Union's own policies, require that suspicious activities be reported to the appropriate authorities. The fact that Mr. Bartoli was buying livestock and diverting Cyprus Funds' investor monies for his personal use, instead of using the money to purchase stocks for Cyprus Funds, were clear examples of suspicious activity that Ms. Diaz or Mr. Romanach should have reported.   As a result of their failure to comply with these standards and policies, Ms. Diaz and Mr. Romanach furthered the intent and purposes of the Cyprus Funds' Ponzi scheme.

29.     Both Ms. Diaz and Mr. Romanach received commissions from their dealings with Mr. Bartoli. In fact, in 1996 the commissions they generated from Mr. Bartoli was greater than any of their other individual clients. Ms. Diaz and Mr. Romanach personally realized over $100,000.00 in commissions during the span of time that Mr. Bartoli had a trading account with First Union.

30.     During the summer of 1996 – the same year that Mr. Bartoli and Cyprus Funds were generating large commissions for First Union, Ms. Diaz and Mr. Romanach – Ms. Diaz and Mr. Romanach accompanied Mr. Bartoli to Ecuador to make joint presentations to Ecuadorian prospects. Mr. Bartoli invited the First Union representatives because he knew that First Union's presence in Ecuador would add legitimacy to his solo presentation and could increase the number of Cyprus Funds' investors.  After Ms. Diaz and Mr. Romanach explained First Union's products, Ms. Diaz

10

and/or Mr. Romanach told the potential investors that if they were interested in other options, they should listen to Mr. Bartoli's presentation. Mr. Bartoli was present during all of Ms. Diaz' and Mr. Romanach's presentations. Similarly, while Mr. Bartoli gave his own presentation and discussed Cyprus Funds, Ms. Diaz and Mr. Romanach were in the room.

31.      In discussing Cyprus Funds, Mr. Bartoli also stated that First Union was the custodian of the fund, thus adding legitimacy to the sales pitch. Ms. Diaz and Mr. Romanach knew that their presence would be construed by investors as First Union's approval of Cyprus Funds in general, and their role as "fund custodian" in particular. By not speaking up, Ms. Diaz and Mr. Romanach knowingly and intentionally made misrepresentations and omissions regarding the custody of the mutual fund, making the Cyprus Funds scheme more attractive to investors. Furthermore, Ms. Diaz and Mr. Romanach were aware of or should have known that Mr. Bartoli was relying on First Union's name to get and keep Cyprus Funds' investors.

32.      Both Ms. Diaz and Mr. Romanach wrote letters on behalf of Cyprus Funds and Mr. Bartoli, adding further credibility to the scheme. In addition to being custodian of the mutual fund and drafting letters on behalf of Cyprus Funds and Mr. Bartoli, First Union also helped promote Cyprus Funds' mutual fund, as is evidenced by notes written by Mr. Rozencwaig taken during a conversation with Mr. Bartoli on January 25, 1996. These notes state that "F[irst] Union is selling the Fund – they told Eric [Bartoli] there is no problem w/promoting the Fund and they are doing it." A copy of these notes is attached hereto as Exhibit "C."

33.      First Union, as Cyprus Funds' fund custodian, had a duty to protect and care for the mutual fund's assets. First Union failed to exercise a reasonable degree of protection and care when it assisted Mr. Bartoli and the insiders in diverting Cyprus Funds' investor monies for their own

11

personal use instead of being invested in the mutual fund. First Union should be held accountable for the losses of assets which they agreed to exercise custody over.

34.     Ms. Diaz, Mr. Romanach, and First Union, knew or should have known that Cyprus Funds was an illegal Ponzi scheme. Statements from Cyprus Funds' First Union accounts show that Mr. Bartoli and the insiders transferred funds from Cyprus Funds' First Union accounts into and out of their personal accounts and other companies. In fact, there were 108 wire transfers which diverted $4,836,500.00 out of Cyprus Funds' First Union accounts and into accounts of entities owned and controlled by Mr. Bartoli and the insiders.

35.     During the entire time that Mr. Bartoli maintained accounts at First Union, both Ms. Diaz and Mr. Romanach ignored the abundant evidence that Cyprus Funds' business was a Ponzi scheme, and allowed themselves and First Union to be used as a lure for unsuspecting investors into the Cyprus Funds Ponzi scheme. There was abundant evidence to show Ms. Diaz, Mr. Romanach and First Union that Cyprus Funds was a Ponzi scheme. First Union's own bank statements show that new investor money deposited into the Cyprus Funds' First Union accounts was used to pay old investors and for the personal use of Mr. Bartoli and the insiders, and not to purchase shares of stock.

36.     Despite this evidence, Ms. Diaz and Mr. Romanach never verified or questioned any of the information provided by Mr. Bartoli, even after restrictions preventing further debits were placed on the Cyprus Funds' First Union accounts after checks were presented with insufficient funds to cover them. Moreover, when Mr. Bartoli informed Ms. Diaz in mid-1999 that Cyprus Funds was being sold and that it was in the middle of an audit and that all the accounts needed to be restricted, ie., frozen, she did not conduct an investigation regarding the accuracy of this information was conducted. When Mr. Bartoli informed Ms. Diaz a little while later that everything was "okay,"

she lifted the restrictions – no questions asked.

37.     First Union ignored the many overdrafts in the Cyprus Funds accounts, despite the obvious danger this posed to the security of the investors' funds, for which First Union was the custodian.  In fact, Mr. Bartoli requested that Ms. Diaz immediately return any check that comes through for payment where there may be insufficient funds.  This put Ms. Diaz on notice that the monies invested by Cyprus Funds' investors were dangerously low.  Ms. Diaz took no steps to investigate or report this (or any other) suspicious activity, even though the Cyprus Funds account had a history of overdrafts.

38.     First Union willingly lent its name to Cyprus Funds to add credibility to the scheme.  In addition to allowing First Union to be listed as the Fund Custodian on Cyprus Funds' PPM, Ms. Diaz and Mr. Romanach provided letters vouching for Mr. Bartoli and stating that First Union was the Fund Custodian.  The PPM and letters were made available to potential or existing Cyprus Funds' investors and facilitated the scheme perpetrated by Cyprus Funds.

39.     In sum, First Union and its agents either willingly or cooperatively (or with a willful blindness as to the illegality of the Cyprus Funds scheme) assisted Cyprus Funds, Mr. Bartoli, and the insiders in convincing potential or existing investors to invest in Cyprus Funds' mutual fund.  By allowing overdrafts, First Union allowed Cyprus Funds to conceal its true financial condition and enabled it to distribute on time some of the promised returns to the investors of Cyprus Funds.  First Union, Ms. Diaz and Mr. Romanach were key players in the Cyprus Funds scheme by providing a means to divert invested monies between Cyprus Funds' accounts at First Union and the personal accounts of Mr. Bartoli and the insiders, and their other companies.

**The Smith Investment**

40.      Class Representative, Mr. Smith is 59 years old and lives with his wife, Georgia, in Ohio. In late 1997, Mr. Smith invested $11,195.80, which represented funds from an IRA, which he believed could be "rolled over" into Cyprus Funds. According to the statements sent to Mr. Smith from Cyprus Funds, Mr. Smith's investment grew.

41.      In early 1999, Mr. Smith retired from Ameritech in Ohio. Based upon the perceived strength of his earlier investment in Cyprus Funds, Mr. Smith invested his entire 401K plan ($317,181.98) with Ameritech and his lump sum retirement buy-out ($272,010.45) with Cyprus Funds.

42.      All of the funds invested by Mr. Smith were to entrusted to First Union, the Fund Custodian for Cyprus Funds.

43.      In July 1999, Mr. Smith received a $3,000.00 check from Cyprus Funds, purporting to represent dividends on his investment. The check was returned twice by Mr. Smith's bank for insufficient funds. Mr. Smith complained to Cyprus Funds through one of its agents, who was able to obtain approval from First Union to have the check honored and the funds released.

44.      On or around September 1999, Mr. Smith was advised that his entire investment in Cyprus Funds was gone despite earlier account statements reflecting large returns on his initial investments. Having lost his family's life savings, Mr. Smith returned to work at Ameritech.

**The Estes Investment**

45.      Class Representative, Ms. Estes is 68 years old and lives with her husband, Douglas, in Ohio.

46.      In late August of 1998, Ms. Estes invested $228,809.99 with Cyprus Funds

14

representing what she believed to be a "rollover" of her Oppenheimer IRA account.

47.     All of the funds invested by Ms. Estes were entrusted with First Union, the Fund

Custodian for Cyprus Funds.

48.     For nearly a year, Cyprus Funds sent account statements demonstrating a strong

return on these initial investments.

49.     Ms. Estes received regular monthly distribution from Cyprus Funds until July of

1999, when a distribution check was returned by her credit union for insufficient funds.  Ms. Estes

has since been advised that the funds she invested are gone.

## CLASS REPRESENTATION ALLEGATIONS

50.     Pursuant to Rule 23 (a) and (b)(3), Fed.R.Civ.P., the Class Representatives bring this

action on their own behalf and on behalf of all others similarly situated.

**The Definition of the Class**

51.     The Class is defined as follows:

> All persons and entities who invested monies into Cyprus Funds'
> mutual fund from 1995 through August 1999, and who have suffered
> damages as a result of such investments.

**Numerosity**

52.     Pursuant to Rule 23(a)(1), the members of the Class are so numerous that separate

joinder of each Class member is impracticable.  The members of the Class are believed to exceed

500, with the exact number to be ultimately determined from the records of Cyprus Funds, whether

maintained or reconstructed by the Receiver.

**Commonality**

53.     Pursuant to Rule 23(a)(2), common questions of fact and law affect the claims of

15

each member of the designated Class; namely, whether First Union participated, either by intentional acts or willful blindness in the Cyprus Funds Ponzi scheme, by conspiring to commit fraudulent transfers and by failing to comply with industry and First Union standards, making funds unavailable to reimburse victims of the scheme. A class action is the most efficient and effective device for resolving the claims alleged herein against First Union.

54.    The following are specific issues of fact common among the Class:

(A)    The manner in which the members of the Class invested in Cyprus Funds' mutual fund;

(B)    Cyprus Funds' lack of legitimate business operations for selling shares of the Cyprus Funds' mutual fund;

(C)    The theft of monies from Cyprus Funds by Mr. Bartoli and the insiders;

(D)    First Union's knowledge of the Cyprus Funds scheme;

(E)    First Union's actions in furthering the Cyprus Funds scheme, including providing correspondence on behalf of Mr. Bartoli, allowing First Union's name to be listed on the Cyprus Funds' PPM as Fund Custodian, and transferring millions of dollars from Cyprus Funds' First Union accounts into Mr. Bartoli's and the insiders' other accounts and companies; and

(F)    The measure and amount of damages caused by the conduct of First Union.

55.    The following are specific issues of law common to each member of the Class:

(A)    The illegality of the Cyprus Funds Ponzi scheme;

(B)    First Union's knowledge or willful blindness of its role and assistance to Cyprus Funds, Mr. Bartoli and the insiders in further the Cyprus Funds scheme;

(C)    Whether the transfers of funds from Cyprus Funds' First Union accounts, through First Union, to Mr. Bartoli's and the insiders' other accounts and companies and payment of false interest were done without adequate consideration;

16

(D)    Whether the transfer of funds from Cyprus Funds' First Union accounts, through First Union, to Mr. Bartoli's and the insiders' other accounts and companies was done at a time when Cyprus Funds was insolvent and/or these transfers rendered Cyprus Funds insolvent;

(E)    Whether First Union combined, confederated, agreed, and/or conspired to further the Cyprus Funds scheme;

(F)    Whether First Union's misrepresentations, omissions and participation induced individuals to invest monies into Cyprus Funds;

(G)    Whether First Union failed to use reasonable care by not properly holding, safeguarding, or accounting for property committed to its care;

(H)    Whether by virtue of its status as Fund Custodian, First Union breached its fiduciary duty to the Class; and

(I)    Whether First Union aided Mr. Bartoli and the Cyprus Funds insiders in fraudulently diverting investor funds.

**Typicality**

56.    Pursuant to Rule 23(a)(3), the claims the Class Representatives are typical of the claims of each member of the Class. The legal claims asserted in this action, as well as the facts underlying those claims, are the same as would be advanced by all members of the Class were they to institute individual actions. Further, members of the Class have sustained damages as a result of the same course of misconduct by First Union in the Cyprus Funds scheme.

**Adequacy of Representation**

57.    Pursuant to Rule 23(a)(4), Mr. Smith and Ms. Estes are adequate representatives of the Class and will fairly and adequately protect the interests and rights of the Class. As Class Representatives, Mr. Smith and Ms. Estes are aware of their duties on behalf of the Class and have agreed to undertake those responsibilities to the best of their ability. The claims of the Class Representatives are not antagonistic in any way to the interests of other Class members, nor are there

17

any significant conflicts of interest between the Class Representatives and any members of the Class. The Class Representatives are committed to the vigorous prosecution of this action.

58.     The Class Representatives have retained undersigned counsel to represent them in this action. Said counsel are experienced in class action and complex commercial litigation matters, and are financially able and sufficiently staffed to see this case through conclusion.

59.     The adequacy of the Class is further demonstrated by support of the Receiver, who is financially able and prepared to proceed with the claims against First Union, and who is fully aligned with the interests of the Class in proving and recovering damages from First Union.

**First Requirement of Rule 23(b)(3) - Predominance of Common Issues**

60.     Questions of law and fact common to the claims of each member of the Class predominate over any question of law or fact affecting individual members of the Class. As is demonstrated under the commonality allegations above, the focus of this lawsuit is on the common issues of the Class' victimization by First Union's active involvement, participation, and/or assistance in the illegal scheme perpetrated by Mr. Bartoli and the insiders, or by First Union's willful and reckless disregard for such actions.

**Second Requirement of Rule 23(b)(3) - Superiority of Class Treatment**

61.     Class treatment in this action is superior to the institution and maintenance of individual suits by individual members of the Class.

62.     There is no strong interest by individual Class members in separately filing and prosecuting their claims in individual suits against First Union. Many of the Class members lack sufficient finances to retain competent counsel willing to undertake a suit against First Union, a huge bank with formidable financial and legal resources to oppose individualized suits. Also, some of the

18

monies invested by Cyprus Funds' investors are modest in relation to the costs and risks associated with suing a litigant like First Union, and therefore render individualized suits cost prohibitive. In contrast, class treatment is the most efficient and fair method of adjudicating the claims alleged herein against First Union.

63. The subject matter giving rise to the claims asserted here by the Class are the subject of ongoing litigation against Cyprus Funds and certain of its former principals in the action styled *Securities and Exchange Commission vs. Latin American Services Co., Ltd., Cyprus Funds, Inc., et. al,* case no. 99-2360-CIV-UNGARO-BENAGES (the "SEC action"). The nature, extent, and manner of the scheme perpetrated by Mr. Bartoli and the insiders is essentially the same in the SEC action as in this case. While the SEC action focuses on one common issue of fact concerning the conduct of the scheme by Mr. Bartoli and the insiders, the SEC action and the relief sought therein is not concerned with the facts or legal claims against First Union. Based upon the continued pendency of the SEC action, it desirable to concentrate this class action in the Southern District of Florida. In addition, First Union has numerous offices, branches and agents and conduct substantial business in this District. Many of the acts and omissions giving rise to First Union's liability occurred here. There is no other forum more convenient or desirable than the Southern District of Florida, where Cyprus Funds maintained its bank accounts.

64. There are no significant or unusual difficulties associated with the facts and legal theories giving rise to these claims which would preclude the maintenance of this case as a class action.

## COUNT I - CIVIL CONSPIRACY TO COMMIT FRAUDULENT TRANSFERS

65. The Receiver and the Class Representatives reallege paragraphs 1 through 64 above

as fully set forth herein.

66.     The Receiver and the Class Representatives assert this Count against First Union

for civil conspiracy to commit fraudulent transfers.

67.     First Union, Ms. Diaz, Mr. Romanach, Mr. Bartoli and the insiders of Cyprus

Funds agreed, confederated, combined, and/or conspired to accomplish an unlawful purpose; to wit,

the fraudulent transfer of property from Cyprus Funds' investors to the personal bank accounts

and/or other companies of Mr. Bartoli and the insiders.  Additionally, First Union facilitated the

illegal transfer of monies from Cyprus Funds to investors, including the distribution of false

redemption and interest payments.

68.     These fraudulent transfers were made with the actual intent to hinder, delay, or

defraud the investors of Cyprus Funds.  Funds that were provided by investors with the purpose of

investing in a mutual fund were instead diverted to Mr. Bartoli's and the insiders' other personal

bank accounts or to companies which Mr. Bartoli and the insiders owned and controlled.  Moreover,

First Union and Cyprus Funds fraudulently transferred monies from Cyprus Funds to investors,

including the distribution of false redemption and interest payments through the operation of a Ponzi

scheme.

69.     First Union effectuated the transfers from Cyprus Funds' First Union accounts and

into Mr. Bartoli's and the insiders' personal accounts and to other companies when Cyprus Funds'

assets were unreasonably small in relation to the transactions and at a time when Cyprus Funds was

insolvent or First Union knew, or reasonably should have known that the transfers would render it

insolvent.

70.     Moreover, these transfers were made to Mr. Bartoli's and the insiders' personal bank

accounts and to other companies without adequate consideration.

71.     First Union, Ms. Diaz and Mr. Romanach willingly agreed to participate in the Cyprus Funds scheme or, at the very least, combined and conspired with Mr. Bartoli and the insiders by casting a blind eye to the illegality of the Cyprus Funds scheme -- the same scheme which allowed First Union, Ms. Diaz and Mr. Romanach to "earn" large commissions.

72.     First Union took action in pursuance of the illegal transfer of property out of Cyprus Funds, including performance of the following actions:

>    (A)     providing First Union accounts for Cyprus Funds which Mr. Bartoli and the insiders used as a conduit for having investors deposit monies for the mutual fund, and allowing the diversion of funds for the personal use of Mr. Bartoli and the insiders;

>    (B)     completing hundreds of wire transfers and withdrawals, totaling millions of dollars in investor funds, to Mr. Bartoli's and the insiders' personal bank accounts and other companies, where the funds would otherwise be available for creditor claims;

>    (C)     completing millions of dollars worth of wire transfers between Cyprus Funds' First Union accounts and Cyprus Funds accounts at Banco del Pichincha;

>    (D)     doing business with Cyprus Funds while knowing the illegality of Cyprus Funds', Mr. Bartoli's and the insiders' scheme, and thereby lending First Union's name, and its credibility to the Cyprus Funds scheme;

>    (E)     failing to comply with industry standards and First Union's own internal

21

rules to "know your customer"; and

(F)     failing to report any suspicious activity to the appropriate personnel.

73.     As a direct and proximate result of First Union's conspiracy to commit fraudulent transfers, the Plaintiffs have suffered uncompensated damages.

**WHEREFORE**, the Receiver and the Class Representatives, individually and on behalf of the Class, demand judgment against Defendants, First Union National Bank and First Union Securities, Inc., jointly and severally, for compensatory damages, prejudgment interest, costs, and such other relief as this Court deems just and proper.

## COUNT II - AIDING AND ABETTING FRAUDULENT TRANSFERS

74.     The Receiver and Class Representatives reallege paragraphs 1 through 64 above as fully set forth herein.

75.     The Receiver and Class Representatives assert this Count against First Union for aiding and abetting fraudulent transfers.

76.     Cyprus Funds and its insiders, with the assistance of First Union, defrauded investors by fraudulently transferring investor monies out of Cyprus Funds' First Union accounts and into Mr. Bartoli's and the other insiders' personal bank accounts and other companies.

77.     These fraudulent transfers were made with the actual intent to hinder, delay, or defraud the investors of Cyprus Funds.  Funds that were provided by investors with the purpose of investing in a mutual fund were instead diverted to Mr. Bartoli's and the insiders other personal bank accounts or to companies which these insiders owned and controlled.  Moreover, First Union and Cyprus Funds fraudulently transferred monies from Cyprus Funds to investors, including the distribution of false redemption and interest payments through the operation of a Ponzi scheme.

22

78.    First Union effectuated the transfers from Cyprus Funds' First Union accounts and into Mr. Bartoli's and the insiders' personal accounts and other companies when Cyprus Funds' assets were unreasonably small in relation to the transactions and at a time when Cyprus Funds was insolvent or First Union knew, or reasonably known that the transfers would render it insolvent.

79.    Moreover, these transfers were made to Mr. Bartoli's and the insiders' personal bank accounts or other companies without adequate consideration.

80.    The investors relied on the fact that their monies would be a safe investment in Cyprus Funds' mutual fund, which were deposited in Cyprus Funds' First Union accounts at First Union.

81.    First Union knew, or should have known, that Cyprus Funds was committing fraudulent transfers and actively and knowingly rendered substantial assistance to Cyprus Funds in the fraud by, among other things:

(A)    providing First Union accounts for Cyprus Funds which Mr. Bartoli and the insiders used as a conduit for having investors deposit monies for the mutual fund, and allowing the diversion of funds for the personal use of Mr. Bartoli and the insiders;

(B)    completing hundreds of wire transfers and withdrawals, totaling millions of dollars in investor funds, to Mr. Bartoli's and the insiders' personal bank accounts and other companies, where the funds would otherwise be available for creditor claims;

(C)    completing millions of dollars worth of wire transfers between Cyprus Funds' First Union accounts and Cyprus Funds accounts at Banco del

23

Pichincha;

(D)     doing business with Cyprus Funds while knowing the illegality of the Cyprus Funds', Mr. Bartoli's and the insiders' scheme, and thereby lending First Union's name, and its credibility to the Cyprus Funds scheme;

(E)     failing to comply with industry standards and First Union's own internal rules to "know your customer"; and

(F)     failing to report any suspicious activity to the appropriate personnel.

82.     First Union aided and abetted the fraudulent transfers committed by Cyprus Funds and its insiders and is liable for the damages caused thereby to the same extent as Mr. Bartoli and the other Cyprus Funds' insiders.

83.     As a direct and proximate result of First Union's aiding and abetting Cyprus Funds' fraudulent transfers, the Plaintiffs have suffered uncompensated damages.

**WHEREFORE**, the Receiver and the Class Representatives, individually and on behalf of the Class, demand judgment against Defendants, First Union National Bank and First Union Securities, Inc., jointly and severally, for compensatory damages, prejudgment interest, costs, and such other relief as this Court deems just and proper.

## COUNT III - COMMON LAW FRAUD AND/OR AIDING AND ABETTING COMMON LAW FRAUD

84.     The Receiver realleges paragraphs 1 through 64 above as fully set forth herein.

85.     The Receiver asserts this Count against First Union for common law fraud and/or aiding and abetting common law fraud.

86.     First Union knowingly made material misrepresentations and omissions and

24

knowingly participated in the scheme in order to induce individuals to invest monies into Cyprus Funds by:

    (A)    providing First Union accounts for Cyprus Funds which Mr. Bartoli and the insiders used as a conduit for having investors deposit monies for the mutual fund, and allowing the diversion of funds for the personal use of Mr. Bartoli and the insiders;

    (B)    completing hundreds of wire transfers and withdrawals, totaling millions of dollars in investor funds, to Mr. Bartoli's and the insiders' personal bank accounts and to other companies, where the funds would otherwise be available for creditor claims;

    (C)    completing millions of dollars worth of wire transfers between Cyprus Funds' First Union accounts and Cyprus Funds accounts at Banco del Pichincha;

    (D)    providing letters vouching for Cyprus Funds' relationship with First Union, including that Mr. Bartoli was a preferred client and that First Union had custody of the funds;

    (E)    knowingly and willingly allowing First Union's name to appear on Cyprus Funds' PPM;

    (F)    Participating in joint presentations with Mr. Bartoli in Ecuador to prospective investors, and allowing Mr. Bartoli to use First Union's name and reputation to provide assurances to potential and existing investors;

    (G)    doing business with Cyprus Funds while knowing the illegality of the Cyprus

25

Funds', Mr. Bartoli's and the insiders' scheme, and thereby lending First

Union's name, and its credibility to the Cyprus Funds scheme;

(H)    failing to comply with industry standards and First Union's own internal

rules to "know your customer."

(I)    lifting restrictions on Cyprus Funds' First Union accounts with reckless

disregard for the status of the account and without conducting any

investigations;

(J)    failing to report any suspicious activity to the appropriate personnel.

87.    First Union knew or should have known that Cyprus Funds was a fraud.

Additionally, First Union knew or should have known that their acts, misrepresentations and material

omissions would mislead Cyprus Funds' investors by creating respectability and credibility for the

activities of Cyprus Funds, Mr. Bartoli and the insiders. Cyprus Funds' investors relied on First

Union's designation as the Fund Custodian and invested in Cyprus Funds and deposited monies into

Cyprus Funds' First Union accounts – monies which were ultimately diverted to the personal use

of Mr. Bartoli and the insiders.

88.    The conduct of Ms. Diaz and Mr. Romanach, as set forth in the preceding

paragraphs, caused substantial damages to members of the Class. The acts, misrepresentations and

material omissions of First Union were done fraudulently, willfully and maliciously, justifying an

award of punitive damages against them.

89.    First Union is liable for the fraud of their agents and employees, Ms.

Diaz and Mr. Romanach based on actual agency, apparent agency and negligent supervision.

90.    As a direct and proximate result of First Union's actions, the Plaintiffs have

suffered uncompensated damages.

**WHEREFORE**, the Receiver, demands judgment against Defendants, First Union National

Bank and First Union Securities, Inc., jointly and severally, for compensatory damages, punitive

damages, prejudgment interest, costs, and such other relief as this Court deems just and proper.

## COUNT IV - COMMON LAW NEGLIGENCE

91.     The Receiver and Class Representatives reallege paragraphs 1 through 64 above as

fully set forth herein.

92.     The Receiver and Class Representatives assert this Count against First Union for

breach of common law negligence.

93.     First Union either authorized or knew of its designation as Cyprus Funds' Fund

Custodian in Cyprus Funds' PPM.

94.     As a result of this designation, a special relationship was created between Plaintiffs

and First Union. This relationship required First Union to use reasonable care in exercising its duties

as Fund Custodian while holding, safeguarding, or accounting for property committed to its care.

Further indica of a special relationship between Cyprus Funds and First Union is found in the fact

that First Union provided extensive brokerage services to Cyprus Funds.

95.     First Union breached its duty of reasonable care by not properly holding,

safeguarding, or accounting for property committed to its care.

96.     As a direct and proximate result of First Union's negligence, Cyprus Funds'

mutual fund became insolvent, causing Plaintiffs to suffer uncompensated damages.

**WHEREFORE**, the Receiver and the Class Representatives, individually and on behalf of

the Class, demand judgment against Defendants, First Union National Bank and First Union

27

Securities, Inc., jointly and severally, for compensatory damages, prejudgment interest, costs, and such other relief as this Court deems just and proper.

## COUNT V - BREACH OF FIDUCIARY DUTY AS FUND CUSTODIAN

97.    The Receiver and Class Representatives reallege Paragraphs 1 through 64 above as fully set forth herein.

98.    The Receiver and Class Representatives assert this Count against First Union for breach of fiduciary duty.

99.    First Union either authorized or knew of its designation as Cyprus Funds' Fund Custodian in the Cyprus Funds' PPM.  This designation created a special relationship between Plaintiffs and First Union, which imposed upon First Union a fiduciary duty to act at all times the Plaintiffs' best interests.

100.    A custodian has a duty to hold, safeguard, and account for property committed to its care.  As Fund Custodian for Cyprus Funds, First Union had a fiduciary duty to Plaintiffs to hold, safeguard and account for monies invested in Cyprus Funds' First Union accounts.

101.    First Union breached their fiduciary duty when it allowed monies deposited into Cyprus Funds' First Union accounts from investors to flow into and out of Banco del Pichincha, and when First Union allowed Cyprus Funds' monies to be diverted into Mr. Bartoli's and the insiders' personal bank accounts and other companies.

102.    As a direct and proximate result of First Union's breach of fiduciary duty,  Cyprus Funds' mutual fund became insolvent, causing Plaintiffs to suffer uncompensated damages.

**WHEREFORE**, the Receiver and the Class Representatives, individually and on behalf of

28

the Class, demand judgment against Defendants, First Union National Bank and First Union

Securities, Inc., jointly and severally, for compensatory damages, prejudgment interest, costs, and

such other relief as this Court deems just and proper.

### COUNT VI - AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

103.    The Receiver and Class Representatives reallege paragraphs 1 through 64 above as

fully set forth herein.

104.    The Receiver and Class Representatives assert this Count against First Union for

aiding and abetting breach of fiduciary duty.

105.    Cyprus Funds and its insiders had a fiduciary duty to the Cyprus Funds investors to

invest their monies into a mutual fund. Cyprus Funds and the insiders breached this duty when it

fraudulently transferred investor monies deposited in Cyprus Funds' First Union accounts for the

personal use of insiders, instead of purchasing shares of stock for the mutual fund.

106.    Ms. Diaz, Mr. Romanach and First Union knew that Cyprus Funds had a fiduciary

duty to its investors.  Ms. Diaz, Mr. Romanach and First Union also knew that Cyprus Funds and

its insiders were breaching its duties to investors by fraudulently diverting their money.

107.    Ms. Diaz, Mr. Romanach and First Union aided and abetted Cyprus Funds and the

insiders breach their fiduciary duty by:

      (A)    providing First Union accounts for Cyprus Funds which Mr. Bartoli and the

insiders used as a conduit for having investors deposit monies for the mutual

fund, and allowing the diversion of funds for the personal use of Mr. Bartoli

and the insiders;

      (B)    aiding in the completion of hundreds of wire transfers and withdrawals,

29

totaling millions of dollars in investor funds, to Mr. Bartoli's and the insiders' personal bank accounts and other companies, where the funds would otherwise be available for creditor claims; and

(C)     completing millions of dollars worth of wire transfers between Cyprus Funds' First Union accounts and Cyprus Funds accounts at Banco del Pichincha.

108.    As a direct and proximate result of First Union's aiding and abetting Cyprus Funds' breach of fiduciary duty, Cyprus Funds' mutual fund became insolvent, causing Plaintiffs to suffer uncompensated damages.

**WHEREFORE**, the Receiver and the Class Representatives, individually and on behalf of the Class, demand judgment against Defendants, First Union National Bank and First Union Securities, Inc., jointly and severally, for compensatory damages, prejudgment interest, costs, and such other relief as this Court deems just and proper.

### CLASS REPRESENTATION RELIEF

**WHEREFORE**, the Class Representatives, individually and on behalf of all others similarly situated, request the following relief:

(A)     An Order certifying the Class and appropriate sub-classes, if any;

(B)     An Order appointing Robert C. Gilbert, Esq., of Robert C. Gilbert, P.A., as counsel for the Class;

(C)     Final Judgment awarding compensatory damages, punitive damages and prejudgment interest in favor of the Class and against First Union;

(D)     Final Judgment awarding reasonable attorneys' fees and reimbursement of costs and

30

expenses to counsel for the Class; and

(E)    Such other and further relief as this Court deems appropriate.

## DEMAND FOR JURY TRIAL

The Receiver and the Class Representatives demand a jury trial on all claims and issues in this action triable as a matter of right.

Dated: 11/28/10

Respectfully submitted:

KOZYAK, TROPIN & THROCKMORTON, P.A.
Special Counsel for the Receiver
2800 First Union Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 372-1800
Telecopy: (305) 372-3508

By: _____
    Harley S. Tropin
    Florida Bar No. 241253
    Cheryl E. Glickler
    Florida Bar No. 176583


Robert C. Gilbert, P.A.
Counsel for the Plaintiff Class Members
CommerceBank Center
220 Alhambra Circle, Suite 400
Coral Gables, Florida 33134
Telephone: (305) 529-9100
Telecopy: (305) 529-1612

By: _____
    Robert C. Gilbert
    Florida Bar No. 561861
    Sandy P. Fay
    Florida Bar No. 0149047

2914/101/174213.2

31

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

SECURITIES AND EXCHANGE COMMISSION,  )   CASE NO.
                                     )
            Plaintiff,               )   99 - 2360
                                     )
        v.                           )   CR-DAVIS
                                     )
LATIN AMERICAN SERVICES CO., LTD.,   )   TEMPORARY
CYPRUS FUNDS, INC., ERIC V. BARTOLI, )   RESTRAINING ORDER
DOUGLAS R. SHISLER, JAMES L. BINGE,  )   AND OTHER
PETER J. ESPOSITO,                   )   EMERGENCY RELIEF
                                     )
            Defendants,              )
                                     )
B & S FARMS, INC., and FLANDERS      )
INVESTMENT HOLDINGS LIMITED, INC.,   )
                                     )
            Relief Defendants.       )
_____)

FILED by _____

AUG 2 7 1999

CARLOS JUENKE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

This cause comes before the Court upon Motion by Plaintiff Securities and Exchange Commission ("Commission") for the following orders with respect to Defendants Latin American Services Co., Ltd. ("Lasco"), Cyprus Funds, Inc. ("Cyprus Funds"), Eric V. Bartoli ("Bartoli"), Douglas R. Shisler ("Shisler"), James L. Binge ("Binge"), and Peter J. Esposito ("Esposito") (collectively, "Defendants") :

1)      an Order to Show Cause Why a Preliminary Injunction Should Not be Granted;

2)      a Temporary Restraining Order;

3)      an Order Freezing Defendants' Assets;

4)      an Order Requiring Repatriation of Defendants' Assets;

5)      an Order Requiring Accountings;

6)      an Order Prohibiting Destruction of Documents;



EXHIBIT "A"

7)   an Order Expediting Discovery and Answer; and

8)   an Order Requiring Bartoli, Shisler, Binge and Esposito to Temporarily Surrender their Passports to the Clerk of this Court and Prohibiting Them from Travelling Outside the United States Pending Identification of Accounts.

This cause also comes before the Court upon Motion by the Commission for the following orders with respect to Relief Defendants   B & S Farms, Inc. ("B&S Farms") and Flanders Investment Holdings Limited, Inc. ("Flanders") (collectively, "Relief Defendants"):

1)   an Order Freezing Relief Defendants' Assets;

2)   an Order Requiring Repatriation of Relief Defendants' Assets; and

3)   an Order Requiring Accountings.

The Court has considered the Commission's Complaint, Memorandum of Law, and the declarations and exhibits filed in support thereof.   Being fully advised in the premises, the Court finds that the Commission has made a sufficient and proper showing in support of the relief granted herein by presenting a *prima facie* case of securities laws violations by Defendants, and showing a reasonable likelihood that Defendants will harm the investing public by continuing to violate the federal securities laws.  The Court finds good cause to believe that, unless restrained and enjoined by Order of this Court, Defendants will dissipate, conceal or transfer from the jurisdiction of this Court assets which could be subject to an Order of Disgorgement.  Accordingly, the Court hereby orders as follows:

2

I.

## SHOW CAUSE HEARING

IT IS HEREBY ORDERED that the Defendants and Relief Defendants show cause, if any, before the Honorable ⎯⎯JUDGE DAVIS⎯⎯ of this Court, at ⎯3⎯ o'clock ⎯p⎯.m., on the ⎯3rd⎯ day of ⎯SEPTEMBER⎯, 1999, in Courtroom ⎯1, 11th Floor⎯ of the United States Courthouse, ⎯MIAMI⎯, Florida, or as soon thereafter as the matter can be heard, why a Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure should not be granted, as requested by the Commission.

II.

## TEMPORARY RESTRAINING ORDER

IT IS HEREBY FURTHER ORDERED that, pending determination of the Commission's request for a Preliminary Injunction, the Defendants, their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them, and each of them be and they hereby are restrained and enjoined from:

### Section 5 of the Securities Act of 1933 - - as to All Defendants

A.      Directly or indirectly, (a) making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities in the form of units, common stock, warrants or any other securities (including, but not limited to, Cyprus Funds mutual fund shares, certificates of deposit and/or Fixed Interest Rate Investments (hereinafter "Cyprus Fund Shares")), through the use or medium of any prospectus or otherwise, unless and until a registration statement is in effect with the Commission as to such securities; (b) carrying securities,

3

in the form of units, common stock, warrants or any other securities (including, but not limited to, Cyprus Fund Shares), or causing them to be carried through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or for delivery after sale, unless and until a registration statement is in effect with the Commission as to such securities; or (c) making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of any prospectus or otherwise, any securities, in the form of units, common stock, warrants or any other securities (including, but not limited to, Cyprus Fund Shares), unless a registration statement is filed with the Commission as to such securities, or while a registration statement filed with the Commission as to such security is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under Section 8 of the Securities Act of 1933 ("Securities Act"), 15 § U.S.C. 77h, in violation of Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c), provided, however, that nothing in the foregoing portion of this order shall apply to any security or transaction which is exempt from the provisions of Section 5 of the Securities Act, 15 U.S.C. § 77e;

### Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 - - as to All Defendants

B.    Directly or indirectly, by use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any securities (including, but not limited to, Cyprus Fund Shares), knowingly or recklessly: (i) employing devices, schemes or artifices to defraud; (ii) making untrue statements of material facts and omitting to state material facts necessary in order to make the

4

statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaging in acts, practices and courses of business which have operated, are now operating or will operate as a fraud upon the purchasers of such securities in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder; or

### Section 17(a)(1) of the Securities Act of 1933 - - as to All Defendants

C.      Directly or indirectly, by use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities (including, but not limited to, Cyprus Fund Shares), knowingly or recklessly employing devices, schemes or artifices to defraud, in violation of Section 17(a) of the Securities Act, 15 U.S.C. 77q(a);

### Section 17(a)(2) & (3) of the Securities Act of 1933 - - as to All Defendants

D.      Directly or indirectly, by use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities (including, but not limited to, Cyprus Fund Shares), (i) obtaining money or property by means of untrue statements of material facts or omissions to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or (ii) engaging in acts, practices and courses of business which have operated and will operate as a fraud or deceit upon purchasers and prospective purchasers of such securities, in violation of Sections 17(a)(2) & (3) of the Securities Act, 15 U.S.C. §§ 77(q)(a)(2) & (3).

5

IT IS HEREBY FURTHER ORDERED that:

### Section 206(1) and 206(2) of the Investment Advisers Act of 1940 - - as to Defendants Lasco and Bartoli

E.     Defendants Lasco and Bartoli, their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them, and each of them, be and they hereby are, pending determination of the Commission's request for a Preliminary Injunction, restrained and enjoined from, directly or indirectly, by use of the mails or any means or instrumentalities of interstate commerce, directly or indirectly, knowingly, willfully or recklessly: (i) employing devices, schemes or artifices to defraud their clients or prospective clients; or (ii) engaging in transactions, practices and courses of business which are now operating or will operate as a fraud or deceit upon their clients or prospective clients, in violation of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

### Section 7(d) of the Investment Company Act of 1940 - - as to Defendant Cyprus Funds

F.     Defendant Cyprus Funds, its officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them, and each of them, be and they hereby are, restrained and enjoined from, directly or indirectly, making use of the mails or means or instrumentalities of interstate commerce, to offer or sell, or deliver for sale, securities issued by Cyprus Funds (including, but not limited to, Cyprus Fund Shares), in violation of Section 7(d) of the Investment Company Act of 1940, 15 U.S.C. §80a-7(d).

6

## III.

## ASSET FREEZE

IT IS HEREBY FURTHER ORDERED that, pending determination of the Commission's request for a Preliminary Injunction:

A.      Defendants and Relief Defendants, their directors, officers, agents, servants, employees, attorneys, depositories, banks, and those persons in active concert or participation with any one or more of them, and each of them, who receive notice of this order by personal service, mail, facsimile transmission or otherwise, except any Receiver that may be appointed by this Court, be and they hereby are, restrained from, directly or indirectly, transferring, setting off, receiving, changing, selling, pledging, assigning, liquidating or otherwise disposing of, or withdrawing any assets or property, including, but not limited to, cash, free credit balances, fully paid for securities, and/or property pledged or hypothecated as collateral for loans, owned by, controlled by, or in the possession of:

1.      Latin American Services Co., Ltd.,

2.      Cyprus Funds, Inc.,

3.      Eric V. Bartoli,

4.      Douglas R. Shisler,

5.      James L. Binge,

6.      Peter J. Esposito,

7.      B & S Farms, Inc., and

8.      Flanders Investment Holdings Limited, Inc.

B.    That any financial or brokerage institution or other person or entity located within the jurisdiction of the United States courts and holding any such funds or other assets, in the name, for the benefit or under the control of any Defendant or Relief Defendant and which receives actual notice of this order by personal service or otherwise, shall hold and retain within its control and prohibit the withdrawal, removal, transfer, disposition, pledge, encumbrance, assignment, set off, sale, liquidation, dissipation, concealment, or other disposal of any such funds or other assets.

Such banks and brokerages include, without limitation, the following bank and brokerage accounts controlled by the Defendants and/or Relief Defendants:

1.    First Union National Bank, account numbers 2090000968325; 9981020566; 9981019988;

2.    Key Bank Corp., account number 42829830;

3.    Amtrade International Bank, account number 130002119;

4.    Banco Del Pichincha International Miami Agency, account number 23119506;

5.    First Union Brokerage Services, account number 21480133;

and any other brokerage or bank account controlled by any Defendant or Relief Defendant, or which contains proceeds or transfers from the sales of unregistered Cyprus Funds securities described in the Commission's Complaint in this action.

## IV.

## REPATRIATION ORDER

IT IS HEREBY FURTHER ORDERED that, pending determination of the Commission's request for a Preliminary Injunc on, the Defendants and Relief Defendants, their

directors, officers, agents, servants, employees, attorneys, depositories, banks, and those persons in active concert or participation with any one or more of them, and each of them, shall:

(a) take such steps as are necessary to repatriate to the territory of the United States all funds and assets of investors described in the Commission's Complaint in this action which are held by them or are under their direct or indirect control, jointly or singly, and turn over such funds to the Court-appointed Receiver, who shall hold them in a separate account pending further order of this Court, or, if the Court has not appointed a Receiver, to deposit such funds into the registry of the United States District Court for the Southern District of Florida; and

(b) provide the Commission and the Court a written description of the funds and assets so repatriated.

## ACCOUNTINGS

### A.    Accountings by Bartoli, Shisler, Binge, and Esposito

**IT IS HEREBY FURTHER ORDERED** that Bartoli, Shisler, Binge and Esposito shall each make a sworn accounting within five (5) business days of the issuance of this Order to this Court of:

(a) all funds, whether in the form of compensation, commissions, income (including payments for assets, shares or property of any kind), and property or other benefits (including the provision of or payment for services of a personal or mixed business and personal nature) received by one or both of them from Lasco and/or Cyprus Funds;

(b) all assets, funds, or other properties held by one or both of them, jointly or individually, or for each or both of their direct or indirect beneficial interest, or over which one or both of them maintains control, wherever situated, stating the location, value, and disposition of each such asset, fund, and other property; and

(c) each account with any financial or brokerage institution maintained in either of their names, or for one or both of their direct or indirect beneficial interests, or over which one or both of them maintain control, wherever situated, and the names and last known addresses of all bailees, debtors and other persons and entities which have held or are holding their assets, funds or other properties.

**B.     Accountings by Lasco, Cyprus Funds, B & S Farms, and Flanders**

IT IS HEREBY FURTHER ORDERED that Lasco, Cyprus Funds, B & S Farms and Flanders shall each make a sworn accounting within five (5) business days of the issuance of this Order to this Court of all funds received from any source, since January 1, 1993, including, but not limited to, funds received from sales of Cyprus Funds securities.

## VI'

## RECORDS PRESERVATION

IT IS HEREBY FURTHER ORDERED that, pending determination of the Commission's request for a Preliminary Injunction, the Defendants and Relief Defendants, their directors, officers, agents, servants, employees, attorneys, depositories, banks, and those persons in active concert or participation with any one or more of them, and each of them, be and they hereby are restrained and enjoined from, directly or indirectly, destroying, mutilating, concealing, altering, disposing of, or otherwise rendering illegible in any manner, any of the books, records, documents, correspondence, brochures, manuals, papers, ledgers, accounts, statements, obligations, files and other property of or pertaining to the Defendants or Relief Defendants wherever located, until further Order of this Court.

11

## VII

## EXPEDITED DISCOVERY AND ANSWER

IT IS HEREBY FURTHER ORDERED that:

(1)     Immediately upon entry of this Order, the parties may take depositions upon oral examination of parties and non-parties subject to two (2) business days notice.  Should any Defendant or Relief Defendant fail to appear for a properly noticed deposition, that party may be prohibited from introducing evidence at the hearing on the Commission's request for a Preliminary Injunction.

(2)     Service of discovery requests shall be sufficient if made upon the parties by facsimile or overnight courier; depositions may be taken by telephone or other remote electronic means.

(3)     The Defendants and Relief Defendants shall serve an Answer or otherwise respond to the Commission's Complaint within five (5) calendar days from the date of this Order; the Court may deem the Commission's allegations admitted for purposes of the Commission's request for a Preliminary Injunction should a party fail to serve an Answer or otherwise respond within such time.

## VIII

## RETENTION OF JURISDICTION

IT IS HEREBY FURTHER ORDERED that this Court shall retain jurisdiction over this matter and the Defendants and Relief Defendants in order to implement and carry out the terms of all Orders and Decrees that may be entered and/or to entertain any suitable application or motion

12

for additional relief within the jurisdiction of this Court, and will order other relief that this Court

deems appropriate under the circumstances.

DONE AND ORDERED at /Miami/, Florida, this 27 day of Aug., 1999.

_Edward B Davis_
UNITED STATES DISTRICT JUDGE

Copies to:

Christian R. Bartholomew, Esq.
Teresa J. Verges, Esq.
1401 Brickell Avenue, Suite 200
Miami, Florida 33131
**Counsel for Securities and Exchange Commission**
Phone: (305) 982-6344
Fax: (305) 536-7465



**CYPRUS FUNDS** inc.

Oct. 14, 1997

Ms. Zoraida Diaz
First Union National Bank
200 S. Biscayne Blvd.
Miami, Florida   33131

RE: Wire Transfer
Attn.: Lilly
Fax: (305) 789-4862

Dear Ms. Diaz:

I would appreciate it if you would make the following wire transfers from the account of CYPRUS
FUNDS, INC. (#9981019988) to the following account:

> BANK OF COMMERCE
> RAWLINS, WYOMING
> ROUTING# 102303171
> ACCT# 115113
> IN THE NAME OF LADDER LIVESTOCK CO.
> FOR THE SUM OF $94,911.35
> ATTN: LEO CHAPMAN

Please send me by fax a confirmation of the wire transfer to (330) 855-7106.  SHOULD YOU WISH TO
VERIFY THIS TRANSMISSION, PLEASE CALL (330) 855-7105. This is my office phone in Ohio.

I appreciate your consideration.

Sincerely,

Eric Bartoli



EXHIBIT
Composite
"B"

CV8  06520

CYPRUS FUNDS. INC.
P.O. Box 445
Suite 100
1416 Unity Blvd
Belmopan, Belize
Tel.: 501-8-20546
Fax: 501-8-22989

**Ladder Livestock Company LLC**
**Box 159**
**Savery. WY   82332**
**FAX 307-383-2419**

Eric Bartoli
Athens Company
9467 Coal Bank Road
Marshallville. Ohio   44645

October 15, 1997

Dear Eric.

I am sending a copy of the bill which I sent a week ago.  If you want us to bear the entire responsibility for the lambs lost on the truck, the total for the second truck would be as follows:

| Load 2 | 443 lambs | | 42,520.0 pounds |
|---|---|---|---|
| less 2 rams @ 180 # each | | less | 360.0 pounds |
| | | | 42,160.0 pounds |
| less average weight (95.6 #), 7 dead lambs | | | 669.2 pounds |
| | | | 41,490.8 pay weight |
| | | | x $1.12= |
| | | | $46,669.70 |

As we discussed on the phone, normally, livestock lost in transit are the responsibility of the trucker.

We are sorting all our sheep this week, and we should know by the end of the week if we will have one or two loads of lambs in the 85 pound weight range. We do guarantee that they are healthy and sound when they leave us, and your experience bears this out.

I am also sending a draft contract for the lighter lambs. Please contact us if you have any questions.

Sincerely,
Sharon

EVB 06530

**Ladder Livestock Company LLC**
**Box 159**
**Savery. WY  82332**
**FAX 307-383-2419**

Eric Bartoli
Athens Company
9467 Coal Bank Road
Marshallville  Ohio  44645

October 7, 1997

Dear Eric.

I am sending the bill for the lambs which we shipped on October 3rd.

Load 1            446 lambs                42,670.0 pounds
                                    less    853.4 shrink
                                           41,816.6 pay weight
                                             x$1.12=
                                           $46,834.59

Load 2            443 lambs                42,520.0 pounds
        less 2 rams @ 180 # each    less    360.0 pounds
                                           42,340.0 pounds
        less average weight (95.6 #), 3 dead lambs    286.8 pounds
                                           42,053.2 pay weight
                                             x$1.12=
                                           $47,099.58

                2 Hampshire rams          $1,500.00

                        TOTAL $95,434.17

As you can see. I took the shrink to compensate for the wet lambs in
the previous load off the first truck.  We told Carlye we would take
the loss for half the six lambs who died on the truck.  I subtracted

this amount. and the weight of the rams, from the second truck. I hope this is all satisfactory.

Please send the wire to the same account. The bank is the Bank of Commerce. Rawlins, Wyoming; routing number #102303171; account #115113; attention: Leo Chapman.

If you have any questions, please contact us.

Sincerely,

Sharon S. O'Toole

Sharon S. O'Toole

EVB 06532

## Sheep Contract

This agreement, executed on October 19, 1997, between Ladder Livestock Company LLC and Eric Bertoli DBA Athens Company hereinafter called "Seller" and "Buyer." witnesseth: for the sum of Twenty Thousand Dollars ($20,000) as part purchase price, in hand paid to the Seller, said Seller hereby sells and conveys and agrees to deliver to the said Buyer, the following described livestock, and guarantees the title thereto approximately 800 900 lambs at $1.12 per hundredweight to be weighed at the ranch headquarters or on the truck at Baggs, Wyoming. The trucking is to be arranged and paid for by the buyer with delivery to be October, 1997. The lambs covered by this agreement are to weigh approximately 80 to 85 pounds and are guaranteed to be healthy and sound. Buyer agrees to pay the balance of purchase price as provided herein when delivery is completed in accordance with the terms of this contract.

_____            _____
Ladder Livestock Company LLC                Eric Bartoli DBA Athens Company

EVE/ 00533



March 10, 1998

Ms. Zoraida Diaz
First Union National Bank
200 S. Biscayne Blvd.
Miami, Florida  33131

RE: Wire Transfer
Attn.: Lilly
Fax: (305) 789-4862

Dear Ms. Diaz:

I would appreciate it if you would make the following wire transfers from the account of CYPRUS FUNDS, INC. (#9981019988) to the following account:

> BANK OF COMMERCE
> RAWLINS, WYOMING
> ABA# 102303171
> ACCT# 115113
> IN THE NAME OF LADDER LIVESTOCK
> FOR THE SUM OF $40,988.16

Please send me by fax a confirmation of the wire transfer to (330) 855-7106.  SHOULD YOU WISH TO VERIFY THIS TRANSMISSION, PLEASE CALL (330) 855-7105. This is my office phone in Ohio.

I appreciate your consideration.

Sincerely,

Eric Bartoli

CYPRUS FUNDS, INC.
P.O. Box 445
Suite 100
1416 Unity Blvd.
Belmopan, Belize
Tel.: 501-8-20546
Fax: 501-8-22989

EVB 05911

**Ladder Livestock Company LLC**
**Box 159**
**Savery, WY 82332**
**307-383-2418**
**fax 307-383-2419**

Eric Bartoli
Athens Company
9467 Coal Bank Road
Marshallville, Ohio  44645

March 6, 1998

Dear Eric,

On March 1, we shipped 446 feeder lambs to you.  Please wire the payment today to Bank
of Commerce, Rawlins, Wyoming, routing #102303171, account #115113.

| | |
|---|---|
| 446 lambs | 47,440.0 pounds |
| less 4 per cent | 1,897.6 |
| | 45,542.4 pounds |

45,542.4 pay weight
x$ .90
$40,988.16

Thank you.

Sincerely,

*Sharon S. O'Toole*

Sharon S. O'Toole

EVB 00912

1/25/96

O called ERIC

he has not heard from the SEC lawyer in
Ohio
F Union is selling the Fund — they told Eric
there is no problem w/ promoting
the Fund and they're doing it

EXHIBIT

"C"

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

MICHAEL I. GOLDBERG, Receiver, and Lloyd L. Smith and Shirley Estes, individually,

## DEFENDANTS

FIRST UNION NATIONAL BANK and FIRST UNION SECURITIES, Inc.,

**00-4485**
**CIV-GRAHAM**

**MAGISTRATE JUDGE**
**TURNOFF**

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   Miami-Dade
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Active 00cv 4485 Graham/ Turnoff

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Kozyak Tropin & Throckmorton, P.A.
200 S. Biscayne Blvd., Suite 2800 (305) 372-1800
Miami, FL  33131

ATTORNEYS (IF KNOWN)

(d) CIRCLE COUNTY WHERE ACTION AROSE: (DADE), MONROE, BROWARD, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION   (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN   (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT   (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | PERSONAL INJURY | A TORTS PERSONAL INJURY | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | ☐ 310 Airplane | ☐ 362 Personal Injury – Med Malpractice | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury – Product Liability | B☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | B☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | | | B☐ 630 Liquor Laws | A PROPERTY RIGHTS | B☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | PERSONAL PROPERTY | B☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 370 Other Fraud | B☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | B☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| B☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | B☐ 690 Other | A LABOR | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | A☐ 710 Fair Labor Standards Act | B SOCIAL SECURITY | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| A REAL PROPERTY | A CIVIL RIGHTS | PRISONER PETITIONS | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | B☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| B☐ 220 Foreclosure | ☐ 442 Employment | HABEAS CORPUS: | | FEDERAL TAX SUITS | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | B☐ 530 General | ☐ 790 Other Labor Litigation | A☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | A☐ 535 Death Penalty | A☐ 791 Empl. Ret. Inc. Security Act | A☐ 871 IRS – Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | B☐ 540 Mandamus & Other | | | A OR B |
| ☐ 290 All Other Real Property | | B☐ 550 Civil Rights | | | |
| | | B☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION   (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

28 U.S.C. 1332 and 754.  The Plaintiffs bring this action against the Defendants for their involvement in a fraudulent scheme which defrauded investors of million of dollars.

LENGTH OF TRIAL
via ___ days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 50 Million exclusive of interest, costs and fees

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ YES  ☐ NO

## VIII. RELATED CASE(S) IF ANY   (See instructions):

JUDGE  Ursula Ungaro-Benages   DOCKET NUMBER  99-2360-Ungaro-Benages

DATE  November 28, 2000

SIGNATURE OF ATTORNEY OF RECORD

B150400  832274

## FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____